**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANDREW GOLDSMITH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WEIBO CORPORATION, GAOFEI WANG, and HERMAN YU,<br><br>Defendants. | Case No. 2:17-cv-04728 |
| FENG CHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WEIBO CORPORATION, GAOFEI WANG, and HERMAN YU,<br><br>Defendants. | Case No. 2:17-cv-05694 |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Chen Qiwei (the "Plaintiff"), hereby brings this consolidated class action for violations of federal securities laws (the "Consolidated Complaint") against Weibo Corporation ("Weibo" or the "Company"), Gaofei Wang and Herman Yu (collectively, the "Defendants"). The allegations against the Defendants are based on Plaintiff's personal knowledge as to himself and his own acts, and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and under the supervision of Lead Counsel ("Counsel"), which included, among other things, a review of: (1) Weibo's public filings with the U.S. Securities and Exchange Commission ("SEC"); (2) Weibo's other public statements, including press releases and conference calls; (3) Chinese regulations relating to the internet and media; and, (4) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Weibo and the industry in which it operates. Plaintiff believes that substantial additional evidentiary support will exist for his allegations after a reasonable opportunity for discovery. On behalf of himself and the class he seeks to represent, Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff brings this federal securities class action on behalf of himself and a proposed class of persons and entities who purchased or otherwise acquired Weibo American Depository Shares ("ADS") between April 17, 2014 and June 21, 2017, inclusive (the "Class Period"), and were injured by virtue of the misconduct

alleged herein (the "Class," defined more fully below). Plaintiff seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

2. Weibo, incorporated in the Cayman Islands, maintains its principal executive offices at 8/F, QIHAO Plaza, No. 8 Xinyuan S. Road, Chaoyang District, Beijing 100027, People's Republic of China (the "PRC"). Weibo operates as a social media platform for people to create, distribute, and discover Chinese-language content, sometimes described as the "Chinese Twitter." Weibo's content is contributed by Weibo users and platform partners, and includes written and multimedia content. As with most social media platforms, Weibo derives the majority of its revenues through third-party advertising and marketing.

3. Weibo entered the United States public equity markets in 2014. On April 17, 2014, Weibo's ADSs began trading on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "WB." During its initial public offering, Weibo sold 16.8 million ADSs at $17 per ADS for total proceeds of more than $265 million. Weibo more than doubled its actual cash on hand as a result of the initial public offering. In addition, Weibo "enhance[d] [its] brand recognition," one of Weibo's "primary purposes" for the offering.

4. Weibo, as a foreign company headquartered in the PRC, was subject to Chinese regulation over the media, including the internet. Weibo stated in its prospectus for the initial public offering that the Company's "business operations are primarily in the PRC and are primarily subject to PRC laws and regulations." Consequently, investors paid special attention to Weibo's compliance with Chinese regulation and placed significant importance upon Weibo's statements on the matter.

5. United States analysts reported frequently on Weibo's compliance with Chinese regulation. For example, in April 2014, analysts from JG Capital released a research report highlighting Weibo's compliance with PRC regulation. JG Capital wrote that "[b]ased on our previous conversations with management, we believe that . . . Weibo [has] high confidence in their communication and cooperation with the Chinese government, and that the positive relationship will bring healthy growth to Weibo. Also we believe investors' concerns that the government may one day shutdown Weibo are overblown."

6. Weibo, for its part, claimed to be in compliance with PRC regulation at all relevant times, including in particular the Rules for the Administration of Internet Audio and Video Program Services or Circular 56. Circular 56 required, among other things, that in order to "engage in internet audio-visual program service, one shall…***obtain the Permit for Spreading Audio-Visual Programs via Information***

***Network***."[1] Beginning with its prospectus for the initial public offering and continuing through until the end of the Class Period, Weibo represented to investors that it was exempt from Circular 56, did not need to obtain an audio/video transmission license, and, therefore, was not at risk of violating the regulation.[2]

7. Although Weibo consistently stated throughout the Class Period that it ***did not*** hold an audio/video transmission license, claiming instead that "all the audio/video programs posted on our platform are delivered through third-party websites, each of which has an internet audio/video program transmission license," this false public assurance of the legality of its operations ***was not permissible*** under Chinese law. Accordingly, on June 22, 2017, it was announced that The State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China (the "SAPPRFT") had suspended Weibo's video and audio services because it lacked the "information network dissemination of audio-visual programs permit."[3] On this news, Weibo's share price fell $4.71, over 6% from its previous closing price.

8. Defendants knew at all relevant times herein that Weibo was required to obtain a permit in accordance with Circular 56, but opted instead to try and

[1] See, attached Exhibit A, Circular 56, including English translation.

[2] The terms license and permit have the same meaning and are used interchangeably throughout.

[3] See, attached Exhibit B, the June 22, 2017 SAPPRFT Notice with English translation.

circumvent the regulation by delivering content through third-party websites. Defendants engaged in a reckless gamble with investors by assuring the public that a permit was not required, even though they knew the opposite was more than likely to be true based upon the plain language of Circular 56 and other PRC regulations.

9. As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased Weibo ADSs at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

12. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Weibo trades in an efficient market on the NASDAQ.

## III. PARTIES

### A. Lead Plaintiff

13. Plaintiff Chen Qiwei, as previously set forth in his certification supporting his motion for consolidation of related cases and appointment as Lead Plaintiff, incorporated by reference herein, purchased Weibo securities at artificially inflated prices during the Class Period and has been damaged thereby.

### B. The Defendants

#### 1. Weibo

14. Weibo is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business located in the PRC. Weibo's ADSs trade on NASDAQ under the symbol "WB". The Company, through its social media platform, provides an unprecedented and simple way for people and organizations to publicly express themselves in real time, interact with others on a massive global platform and stay connected with the world.

#### 2. Individual Defendants

15. Individual Defendant Gaofei Wang ("Wang") has served as Weibo's Chief Executive Officer ("CEO") since February 2014. Wang has been employed by the Company since its inception, serving in various product and business development roles before being promoted to General Manager in December 2012. Prior to Weibo, Wang was employed by Weibo's original parent company, Sina Corporation ("Sina"). From August 2000 until early 2004, Wang worked in Sina's product development department, at which time he was transferred to Sina's mobile division. Wang was promoted to General Manager of Sina's mobile division in November 2006 and held that position until November 2012.

16. Wang, therefore, directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Weibo and its business, operations, growth, financial statements and financial condition. Because of his position of control and authority, his ability to exercise power and influence with respect to Weibo's course of conduct, and his access to material inside information about Weibo during the Class Period, at all relevant times, Defendant Wang was a controlling person of Weibo within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Wang made materially false and misleading statements concerning the Company's licensing requirements.

17. Individual Defendant Herman Yu ("Yu") served as Weibo's Chief Financial Officer ("CFO") from March 2015 until September 2017. Prior to his role as CFO for Weibo, Yu served as the CFO of former parent company Sina from August 2007 until March 2015. Yu served as Acting CFO of Sina from May 2006 to August 2007 and as Vice President and Corporate Controller from September 2004 to May 2006. Yu is a California Certified Public Accountant.

18. Yu, therefore, directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Weibo and its business, operations, growth, financial statements and financial condition. Because of his position of control and authority, his ability to exercise power and influence with respect to Weibo's course of conduct, and his access to material inside information about Weibo during the Class Period, at all relevant times, Defendant Yu was a controlling person of Weibo within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Yu made materially false and misleading statements concerning the Company's licensing requirements.

19. Wang and Yu are collectively referred to herein as the "Individual Defendants." Weibo and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

**A. Company Background**

20. In 2009, Sina, a leading internet media company in China, created Weibo using the name T.CN Corporation ("T.CN"). T.CN was incorporated in 2010 as a wholly owned subsidiary of Sina, and in 2012, T.CN was renamed Weibo Corporation ("Weibo"). Initially, T.CN was a microblogging service. In 2011, T.CN added social networking features and improved its platform.

21. From 2010 to 2014, Sina provided Weibo with most of its operational services, including, financial, administrative, sales and marketing, human resources, legal, and the services of a number of executives and employees. In April 2014, Weibo became a stand-alone company, completing its initial public offering and listing of its ADSs on NASDAQ.

22. Although no longer a wholly owned subsidiary of Sina, Sina remains Weibo's largest controlling shareholder, owning 54.5% and 49.8% of Weibo's ordinary shares as of March 31, 2016 and March 31, 2017, respectively. To this day, Sina still provides certain support services, and Weibo expects to operate as an affiliate of Sina for as long as Sina is a controlling shareholder.

23. In December of 2013, Weibo acquired Beijing Weibo Interactive Internet Technology Co., Ltd. ("Weibo Interactive") from Sina, which focuses on the online gaming business. On June 30, 2015, the Company acquired two limited

liability partnerships from Sina, collectively, the Weibo Funds, which engage in investing in start-up high-tech companies.

24. Weibo uses a variable interest entity ("VIE") structure to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. Weibo holds 100% of the equity in Weibo Hong Kong Limited ("Weibo HK"), which in turn holds all of the equity in Weibo Internet Technology (China) Co., Ltd ("Weibo Technology"). Weibo conducts its business in China through Weibo Technology. Since Weibo Technology is considered a foreign-invested enterprise, Weibo operates its platform in China through Beijing Weimeng Technology Co., Ltd. ("Weimeng") and its subsidiaries based on a series of contractual arrangements by and among Weibo Technology, Weimeng and its shareholders.




25. Weimeng is owned by four PRC citizens, A. Cao, W. Zheng, Y. Liu and W. Wang, holding 30%, 30%, 20% and 20% of Weimeng's equity interest, respectively, and holding immaterial equity interests in Weibo. Each Weimeng shareholder authorizes Weibo Technology to exercise all of his voting powers in Weimeng. Weibo exerts control over Weimeng and consolidates its operating results into Weibo's financial statements under U.S. GAAP. Weimeng holds the licenses, approvals and key assets that are essential for Weibo's business operations. Specifically, Weimeng holds the Internet Content Provision License, the Bulletin Board Service Permit, the Online Culture Operating Permit, an inter-regional Value-Added Telecommunications Services Operating License, domain names

(weibo.com, weibo.cn, and weibo.com.cn), Weibo's investments and other assets. Per the contractual arrangement, Weimeng shareholders may not voluntarily liquidate or approve the sale, transfer, mortgage or disposal of Weimeng's assets or interests without Weibo's consent. All trademarks relating to Weibo's operations are held by Weibo Technology and Sina's subsidiaries.

26. In April of 2013, Weibo formed a strategic collaboration with Alibaba (a Chinese e-commerce company that provides sales services via web portals, electronic payment services, and a shopping search engine, among other things) and its affiliates to jointly explore social commerce and develop innovative marketing solutions to enable merchants on Alibaba's e-commerce platforms to better connect and build relationships with Weibo's users. This collaboration generates advertising and marketing revenues. Alibaba is Weibo's largest customer whom the Company relies on to offer e-commerce ad solutions to Alibaba's merchants.

## B. Weibo Products and Operations

### 1. Summary of Core Business

27. Weibo is a leading social media platform for people to create, distribute and discover Chinese-language content. It provides an unprecedented and simple way for people and organizations to publicly express themselves in real time, interact with others on a massive global platform and stay connected with the world.

28. Weibo combines the means of public self-expression in real time with a powerful platform for social interaction, as well as content aggregation and distribution. Any user can create and post a feed and attach multimedia or long-form content. User relationships on Weibo may be asymmetric, meaning any user can follow any other user and add comments to a feed while reposting on Weibo's platform. The simple, asymmetric and distributed nature of Weibo allows an original feed to become a live viral conversation stream.

29. Weibo serves a wide range of users including ordinary people, celebrities and other public figures, as well as media outlets, businesses, government agencies, charities and other organizations, making it a microcosm of Chinese society. For many people in China, Weibo allows them to be heard publicly and exposed to the rich ideas, cultures and experiences of the broader world.

30. Media outlets use Weibo as a source of news and as a distribution channel for their headline news. Government agencies and officials use Weibo as an official communication channel for disseminating timely information and gauging public opinion to improve public services. Charities use Weibo to launch charitable projects, seeking donations and volunteers and leveraging the celebrities and organizations on Weibo to amplify their social influence.

31. Weibo's content is contributed by Weibo users and platform partners. They encourage influencers, such as celebrities and media outlets, to use the Weibo

platform to express views and share content. The Company also partners with internet search engines, navigation sites, and web browsers to direct users to the Weibo platform. Additionally, the Company offers social commerce solutions that enable customers to conduct e-commerce on their platform.

32. As demonstrated in the chart below, and as with most social media platforms, the majority of Weibo's revenues come from advertising and marketing. Thus, in addition to "users", Weibo has "customers" to whom they offer advertising and marketing solutions such as display ads, native ads and event-based marketing offerings. Weibo also has value-added services which include game-related services, VIP membership and data licensing.

*Revenues (in thousands $)*

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| Advertising & Marketing | | | |
| Third Parties | $126,644 | $207,567 | $428,257 |
| Alibaba | $107,587 | $143,650 | $57,908 |
| SINA and other related parties | $27,551 | $51,108 | $84,799 |
| Total Advertising & Marketing | $264,782 | $402,415 | $570,982 |
| Other Revenues | $69,390 | $75,476 | $84,818 |
| Total Revenues | $334,172 | $477,891 | $655,800 |

33. Weibo depends on multi-channel networks and platform partners to incubate and grow content creators and help them share content on Weibo. The

Company depends on third-party developers to build, grow and monetize mobile and web applications that integrate with Weibo.

34. ***Weibo's success depends on its ability to provide users with interesting and useful content***, which in turn depends on the content distributed by its users. Content creators, especially influencers, contribute content to Weibo to grow their fan base and increase awareness of their brands.

### 2. Specific Product and Service Segments

#### i. User Segment

35. Weibo's user business segment has been described as the "Chinese Twitter." Weibo tools enable users to create, distribute, discover content and interact with others on its platform in real time. Weibo has designed its platform around the capabilities of mobile devices.

36. The Company offers the following user products: (1) self-expression products; (2) social products; (3) discovery products; (4) notifications; (5) games; (6) VIP membership; and, (7) apps.

37. The self-expression products enable users to express themselves through feeds, individual pages and enterprise pages. The feeds are usually limited to 140 Chinese characters and often include photos, streaming music, short videos or long-form articles. Individual pages display a user's profile, feeds and album. Enterprise pages are for businesses and other organizations allowing them to

perform marketing events, promotion activities, ad campaigns and payment processing on Weibo. The social products allow users to perform the following functions: follow one another; report, comment, and like other feeds; access all feeds in which they are mentioned by other users; send private messages to other users; create and engage in group message boards; and continuously share photos and short videos viewable for 24 hours in slideshow format.

38. As discussed at length below, in order to permit users to post videos, ***Weibo must follow PRC licensing regulations***. Even though heavily regulated, prior to and throughout the Class Period, Weibo touted the importance of video usage and live streaming for the Company, stating, for example:

- [W]e strengthened the multimedia aspect of Weibo. Taking advantage of the adoption of smartphone, 4G and WiFi in China, we are seeing Weibo users consuming more videos and photos. Through our collaboration and product innovation with Miaopai, a leading short video sharing app, we are able to provide Weibo users with a unique and rich experience for creating and sharing short videos on handsets. In June, the average number of daily videos on mobile viewed jumped almost four folds from six months ago, paving the way for us to build a foundation to provide ads in video format in future. (Defendant Wang, August 18, 2015 Conference Call).

- On the user side, strong consumption of video, photo and key opinion leader content are contributing to the robust growth of Weibo traffic. For example, daily video views on Weibo in September 2015 grew 9.7 times from the same period last year. (Defendant Wang, November 18, 2015 Press Release).

- And third, we have ramped up our efforts in these areas. For example, we have taken a leading position in offering user generated short videos through product enhancement and product integration with our investment partner. Weibo's daily video views from the third quarter increased 82% from the previous quarter. The combined views of Weibo's native videos and shared videos in September grew 1.4 times sequentially. We are now beta testing video autoplay which will lay a foundation for us to provide promoted video ads in the future. (Defendant Wang, November 18, 2015 Conference Call).

- During 2015 short video consumption on Weibo saw robust growth, propelling Weibo into a leading position in China. In the fourth quarter daily video views on Weibo reached 290 million, up 53% of the last quarter. Also in the fourth quarter we experimented auto play for Weibo's videos to certain Wi-Fi users and saw video views for this sample user pool increase by 4.5 times. We plan to roll our auto play for Weibo videos based on the results from our beta testing. (Defendant Wang, March 2, 2016 Conference Call).

- But as you have been seeing us in the last two quarters, we've been – in China especially from last year we are seeing a strong growth in video market especially on mobile. And as Weibo start entering in this space with user generated content or short videos and also with live streaming with - I think that probably enlarges the markets go beyond social and to focus on user related - users especially consumer to mobile devices. (Defendant Yu, May 11, 2016 Conference Call).

- In the third quarter, daily video views and live streaming sessions broadcasted maintained strong growth rates. Daily video views in September increased 740% year-over-year and live streaming, which we launched this year, saw its sessions broadcasted in the third quarter increase 124% sequentially, which meaningfully improved time spent per user and Weibo's monetization potential. Going forward, our product development will focus on improving the content creation experience for short videos and live streaming. Previously, users created short videos and live videos on third-party apps and shared them to Weibo. We are now working on making it

more convenient for users to create short videos and perform live streaming directly from Weibo. In the third quarter, we have been focused on increasing the adoption of live streaming as well as product enhancements. The number of key opinion leaders and media companies who have live streamed on Weibo in the third quarter increased by 217% and 385% respectively from the prior quarter. We will continue to focus on increasing the adoption of live streaming by top KOLs and media companies on Weibo. Live streaming is one of the most important multimedia formats on Weibo. With our inherent nature of being mobile, social and viral, Weibo has a natural advantage in offering live streaming, which will help us acquire new users, increase user time spent, and improve our monetization opportunities. The number of KOLs and media accounts who live stream on Weibo will be an important metric for us as having a large network of influential accounts live streaming from Weibo will further strengthen our advantages as a leading social media platform. (Defendant Wang, November 20, 2016 Conference Call).

- Next, this year, we're also focused on improving the user experience for sharing and consuming UGC videos, encouraging greater video engagement and ***making video usage the core function of Weibo***. Since the second half of last year, our product team began to optimize user's experience in the creation and consumption functionalities of UGC videos, such as improving the user's experience and uploading videos in a mobile environment and innovating new ways for users to share videos and interact. (Defendant Wang, May 16, 2017 Conference Call). (Emphasis added).

39. Discovery products help users discover content on the Weibo platform through the information feed (i.e., promoting content on a user's page based on the user's social network), by providing a search feature, by providing object pages (i.e., movie trailers, location based services for movies, restaurant menus, etc.) and through the "discovery channel" where users can explore the hottest trending topics

being discussed on Weibo, as well as access Weibo's online game center and app download center. Users can also choose to receive push notifications from Weibo on their devices.

40. Weibo games offers third party online games, most of which are offered for free with certain games having the option to purchase virtual items. Weibo receives a part of the revenues from such purchases. Weibo Apps are mobile apps developed by Weibo such as an aggregate news source and weather app.

41. Weibo VIP membership offers additional user functions such as increased Page personalization, more cloud storages, voice feed, and access to premium games. Membership is available based on monthly or annual subscriptions.

### ii. Advertising and Marketing Segment

42. Weibo provides advertising and marketing solutions for its customers, enabling them to promote their brands and conduct marketing activities. Through social display ads on Weibo pages, a user can click an ad and be redirected to the advertiser's Weibo Page. Weibo's "promoted marketing" offers promoted feeds, promoted accounts and promoted trends, as well as analytical tools allowing their customers to track and improve the effectiveness of their marketing campaigns. Weibo offers promoted feeds tailored to difference customer segments such as:

targeting certain demographic users (i.e., all of the followers of a given user); Fans Headline, which guarantees a certain feed from the customer will appear at the top of the information feeds of the customer's followers; Weibo Select, which customizes the parameters of the targeted marketing; and Weibo Express, which is offered to key accounts for them to reach and engage with a broad range of Weibo users.

### iii. Platform Partners Segment

43. The Company provides platform partners with tools and application programming interfaces that they can use to share their content on Weibo's platform, distribute Weibo content across their websites and applications, and build social applications on Weibo or integrate their products with Weibo. Weibo's platform partners include traditional and online media outlets, game developers and other applications, multi-channel networks and organizations with media rights.

44. Weibo Connect allows the platform partners to link their websites and mobile apps to Weibo's platform, enabling their users to share content to Weibo. Weibo Service allows third-party developers to build apps to serve individual and organization users. Weibo Wallet enables individuals and businesses to hand out coupons to build a bigger and more active follower base.

## C. Weibo is Subject to Strict Regulatory Licensing Requirements

45. As Weibo's core business is operated within the PRC, Weibo is subject to PRC rules and regulations on foreign ownership, ***licensing***, internet content, taxation, advertising, cyber security, and intellectual property, among others.

46. The Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, promulgated by the State Administration for Radio, Film and Television in 2004, requires anyone engaging in internet broadcasting activities to obtain an audio/video transmission license.

47. On December 20, 2007 (effective January 31, 2008), The State Administration of Radio, Film and Television and the Ministry of Industry and Information Technology ("MIIT") jointly issued the Rules for the Administration of Internet Audio and Video Program Services, also known as Circular 56, which states, among other things, that in order to "engage in internet audio-visual program service, one shall…***obtain the Permit for Spreading Audio-Visual Programs via Information Network***." Specifically, Circular 56 states:

> Article 2: These Provisions shall apply to the provision of audio-visual program service via internet (including mobile internet, hereinafter referred to as internet) within the borders of the People's Republic of China. The term "internet audio-video program service" as mentioned in these Provisions refers to activities of making, redacting and integrating audio-visual programs, providing them to the general public via internet, and providing services for other people to upload and spread audio-visual programs.

> Article 7: To engage in internet audio-visual program service, one shall, in accordance with these Provisions, obtain the Permit for Spreading Audio-Visual Programs via Information Network (hereinafter referred to as Permit) issued by the competent department of radio, film and television, or handle the archive-filing formalities. No entity or individual may engage in internet audio-video program service without obtaining the Permit issued by the competent department of radio, film and television, or handling the archive-filing formalities.

48. Defendants represented that Weimeng was not required to obtain the internet audio/video program transmission license and was not in violation of Circular 56 because Weibo posted ***all of its audio/video programs on its website through third-party websites***. But, ***Circular 56 prohibits this "sub-contracting" or third-party routing structure***:

> Article 14: … No licensed entity may provide fee collection services, signal transmission, server hosting and other related financial and technical services in connection with internet audio-visual program services to any entity on behalf of or for the benefits of any unlicensed or unregistered third party.

49. On December 16, 2016, the SAPPRFT issued Circular 196[4] which again reiterated the requirement for Weibo to obtain an internet audio/video program transmission license, stating that when an entity or individual who does not have the audio/video program transmission license "provides internet audio visual program service by using Weibo…[Weibo] shall be the responsible entity of the service….

[4] See, attached Exhibit C, Circular 196, including English translation.

***The scope of the program shall not exceed the business scope specified by the platform's permit***." Emphasis added.

50. Investors relied on Weibo's statements concerning its compliance with PRC regulation. During Weibo's initial public offering, the Company's compliance with PRC regulation was an important issue to prospective investors. Analysts from JG Capital, for example, placed significant reliance upon management's representations. In a research report dated April 2014, JG Capital wrote that "[b]ased on our previous conversations with management, we believe that . . . Weibo [has] high confidence in their communication and cooperation with the Chinese government, and that the positive relationship will bring healthy growth to Weibo. Also we believe investors' concerns that the government may one day shutdown Weibo are overblown."

51. Defendants succeeded in alleviating investor concerns over potential compliance problems and, in April 2014, Weibo sold 16.8 million ADSs at $17 per ADS for total proceeds of more than $265 million. Weibo also "enhance[d] [its] brand recognition," one of Weibo's "primary purposes" for of offering. By misrepresenting the status of Weibo's compliance with PRC regulation, Defendants were able to access the United States public equity markets at the expense of ordinary investors.

## V. <u>DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD</u>

52. On April 17, 2014, the first day of the Class Period, Weibo filed with the SEC its final offering prospectus (the "2014 Prospectus"), which gave investors the false impression that Weibo was in full compliance with Chinese laws and regulations by operating through third-party websites, stating in relevant part:

> ***In addition, companies engaging in internet broadcasting activities must first obtain an audio/video program transmission license***. See "PRC Regulation—Regulations on Broadcasting Audio/Video Programs through the Internet" for more details. ***Currently, all the audio/video programs posted on our website are delivered through third-party websites***. The VIE is not qualified to obtain the internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company and it was not operating prior to the issuance of the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56. The VIE plans to apply for an internet audio/video program transmission license when feasible to do so.

Emphasis added.

53. The 2014 Prospectus also falsely stated that Weibo was not required to have a license:

> **Regulations on Broadcasting Audio/Video Programs through the Internet**
>
> The Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, promulgated by the State Administration for Radio, Film and Television in 2004, apply to the launch, broadcasting, aggregation, transmission or download of audio/video programs via televisions, mobile phones and the internet and other information networks. ***Anyone who wishes to engage in internet broadcasting activities must first obtain an audio/video program transmission license issued by the***

***State Administration for Radio, Film and Television and must operate pursuant to the scope as provided in such license***. Foreign-invested enterprises are not allowed to engage in these activities.

On December 20, 2007, the State Administration for Radio, Film and Television and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008. Circular 56 reiterates the requirement set forth in the earlier rules that online audio/video service providers must obtain an internet audio/video program transmission license from the State Administration for Radio, Film and Television. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled companies. According to relevant official answers to press questions published on the website of State Administration for Radio, Film and Television on February 3, 2008, officials from the State Administration for Radio, Film and Television and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. These policies have been reflected in the Application Procedure for Audio/Video Program Transmission License. Failure to obtain the internet audio/video program transmission license may subject an online audio/video service provider to various penalties, including fines of up to RMB30,000 ($4,956), seizure of related equipment and servers used primarily for such activities and even suspension of its online audio/video services.

Weimeng is not qualified to obtain an internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company, nor did it begin operation prior to the issuance of Circular 56. Weimeng plans to apply for an internet audio/video program transmission license when it is feasible to do so. ***Currently, all the audio/video programs posted on our platform are delivered through third-party websites, each of which has an internet audio/video program transmission license.***

Emphasis added.

54. The above statements in paragraphs 52 and 53 (identified in emphasis) were materially misleading because they created the false impression that Weibo was complying with PRC regulations concerning the audio/video program transmission license. By representing that the content on Weibo originated through third-party websites, Defendants indicated to investors that Weibo was not at risk of violating Circular 56. In reality, Weibo was violating Circular 56 by routing content through third-parties instead of holding the license itself. Defendants' statements omitted material information about Circular 56, namely that it applied to Weibo and that Weibo was operating in violation of the regulation.

55. On April 28, 2015, Weibo filed with the SEC its Form 20-F for the fiscal year ended December 31, 2014 (the "2014 20-F"), which provided the Company's year-end financial results. Defendants Wang and Yu signed the 2014 20-F.

56. The 2014 20-F gave investors the false impression that Weibo was in full compliance with Chinese laws and regulations by operating through third-party websites, stating in relevant part:

> In addition, ***companies engaging in internet broadcasting activities must first obtain an audio/video program transmission license***. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Broadcasting Audio/Video Programs through the Internet" for more details. Currently, ***all the audio/video programs posted on our website are delivered through third-party***

> ***websites***. Our VIE is not qualified to obtain the internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company and it was not operating prior to the issuance of the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56. Our VIE plans to apply for an internet audio/video program transmission license when feasible to do so.

Emphasis added.

57. The 2014 20-F also falsely stated that Weibo was not required to have a license:

> ***Regulations on Broadcasting Audio/Video Programs through the Internet***
>
> The Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, promulgated by the State Administration for Radio, Film and Television in 2004, apply to the launch, broadcasting, aggregation, transmission or download of audio/video programs via televisions, mobile phones and the internet and other information networks. ***Anyone who wishes to engage in internet broadcasting activities must first obtain an audio/video program transmission license issued by the State Administration for Radio, Film and Television and must operate pursuant to the scope as provided in such license***. Foreign-invested enterprises are not allowed to engage in these activities.
>
> On December 20, 2007, the State Administration for Radio, Film and Television and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008. Circular 56 reiterates the requirement set forth in the earlier rules that online audio/video service providers must obtain an internet audio/video program transmission license from the State Administration for Radio, Film and Television. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled companies. According to relevant official answers to press questions published on the website of State

> Administration for Radio, Film and Television on February 3, 2008, officials from the State Administration for Radio, Film and Television and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. These policies have been reflected in the Application Procedure for Audio/Video Program Transmission License. Failure to obtain the internet audio/video program transmission license may subject an online audio/video service provider to various penalties, including fines of up to RMB30,000 ($4,956), seizure of related equipment and servers used primarily for such activities and even suspension of its online audio/video services.
>
> Weimeng is not qualified to obtain an internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company, nor did it begin operation prior to the issuance of Circular 56. Weimeng plans to apply for an internet audio/video program transmission license when it is feasible to do so. ***Currently, all the audio/video programs posted on our platform are delivered through third-party websites, each of which has an internet audio/video program transmission license.***

Emphasis added.

58. The above statements in paragraphs 56 and 57 (identified in emphasis) were materially misleading because they created the false impression that Weibo was complying with PRC regulations concerning the audio/video program transmission license. By representing that the content on Weibo originated through third-party websites, Defendants indicated to investors that Weibo was not at risk of violating Circular 56. In reality, Weibo was violating Circular 56 by routing content through third-parties instead of holding the license itself. Defendants' statements

omitted material information about Circular 56, namely that it applied to Weibo and that Weibo was operating in violation of the regulation.

59. In addition, the 2014 20-F was accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wang and Yu. In these certifications, Wang and Yu both attested that the 2014 20-F:

> 2. … does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> . . .
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:
>
> > a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> . . .
>
> > c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;
>
> . . .

> 5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):
>
> > a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
> >
> > b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

60. Wang and Yu's SOX certifications were materially misleading. As explained previously, the 2014 20-F failed to accurately describe Weibo's compliance with PRC regulation. The 2014 20-F, therefore, contained untrue statements and omitted "material fact[s] necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To the extent Wang and Yu established and maintained adequate disclosure controls, they disregarded these controls when certifying the 2014 20-F and, as a result, created the false impression that the 2014 20-F was accurate in all material respects.

61. On April 28, 2016, Weibo filed with the SEC its Form 20-F for the fiscal year ended December 31, 2015 (the "2015 20-F"), which provided the Company's year-end financial results. Defendants Wang and Yu signed the 2015 20-F.

62. The 2015 20-F gave investors the false impression that Weibo was in full compliance with Chinese laws and regulations by operating through third-party websites, stating in relevant part:

> In addition, ***companies engaging in internet broadcasting activities must first obtain an audio/video program transmission license***. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Broadcasting Audio/Video Programs through the Internet" for more details. Currently, ***all the audio/video programs posted on our website are delivered through third-party websites***. Weimeng is not qualified to obtain the internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company and it was not operating prior to the issuance of the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56. Weimeng plans to apply for an internet audio/video program transmission license when feasible to do so.

Emphasis added.

63. The 2015 20-F also falsely stated that Weibo was not required to have a license:

> *Regulations on Regulations on Broadcasting Audio/Video Programs through the Internet*
>
> The Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, promulgated by the State Administration for Radio, Film and Television in 2004, apply to the launch, broadcasting, aggregation, transmission or download of audio/video programs via televisions, mobile phones and the internet and other information networks. Anyone who wishes to engage in internet broadcasting activities must first obtain an audio/video program transmission license issued by the State Administration for Radio, Film and Television and must operate

pursuant to the scope as provided in such license. Foreign-invested enterprises are not allowed to engage in these activities.

On December 20, 2007, the State Administration for Radio, Film and Television and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008. Circular 56 reiterates the requirement set forth in the earlier rules that online audio/video service providers must obtain an internet audio/video program transmission license from the State Administration for Radio, Film and Television. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled companies. According to relevant official answers to press questions published on the website of State Administration for Radio, Film and Television on February 3, 2008, officials from the State Administration for Radio, Film and Television and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. These policies have been reflected in the Application Procedure for Audio/Video Program Transmission License. Failure to obtain the internet audio/video program transmission license may subject an online audio/video service provider to various penalties, including fines of up to RMB30,000 ($4,956), seizure of related equipment and servers used primarily for such activities and even suspension of its online audio/video services.

Weimeng is not qualified to obtain an internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company, nor did it begin operation prior to the issuance of Circular 56. Weimeng plans to apply for an internet audio/video program transmission license when it is feasible to do so. ***Currently, all the audio/video programs posted on our platform are delivered through third-party websites, each of which has an internet audio/video program transmission license.***

Emphasis added.

64. The above statements in paragraphs 62 and 63 (identified in emphasis) were materially misleading because they created the false impression that Weibo was complying with PRC regulations concerning the audio/video program transmission license. By representing that the content on Weibo originated through third-party websites, Defendants indicated to investors that Weibo was not at risk of violating Circular 56. In reality, Weibo was violating Circular 56 by routing content through third-parties instead of holding the license itself. Defendants' statements omitted material information about Circular 56, namely that it applied to Weibo and that Weibo was operating in violation of the regulation.

65. In addition, the 2015 20-F was accompanied by SOX certifications by Defendants Wang and Yu. In these certifications, Wang and Yu both attested that the 2015 20-F:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> . . .
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:
>
> > a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

> supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

. . .

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
>
> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

66. Wang and Yu's SOX certifications were materially misleading. As explained previously, the 2015 20-F failed to accurately describe Weibo's

compliance with PRC regulation. The 2015 20-F, therefore, contained untrue statements and omitted "material fact[s] necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To the extent Wang and Yu established and maintained adequate disclosure controls, they disregarded these controls when certifying the 2015 20-F and, as a result, created the false impression that the 2015 20-F was accurate in all material respects.

67. On April 27, 2017, Weibo filed with the SEC its Form 20-F for the fiscal year ended December 31, 2016 (the "2016 20-F"), which provided the Company's year-end financial results. Defendants Wang and Yu signed the 2016 20-F.

68. The 2016 20-F gave investors the false impression that Weibo was in full compliance with Chinese laws and regulations by operating through third-party websites, stating in relevant part:

> In addition, ***companies engaging in internet broadcasting activities must first obtain an audio/video program transmission license***. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Broadcasting Audio/Video Programs through the Internet" for more details. Currently, ***all the audio/video programs posted on our website are delivered through third-party websites***. Weimeng is not qualified to obtain the internet audio/video program transmission license under the current legal regime as it is not a wholly state-owned or state-controlled company and it was not operating prior to the issuance of the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56. Weimeng plans to apply for an internet audio/video program transmission license when feasible to do so.

Emphasis added.

69. The 2016 20-F also falsely stated that Weibo was not required to have a license:

> ***Regulations on Broadcasting Audio/Video Programs through the Internet***
>
> On December 20, 2007, the State Administration for Radio, Film and Television and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008 and was later amended in 2015. Circular 56 reiterates the requirement set forth in the earlier rules that online audio/video service providers must obtain an internet audio/video program transmission license from the State Administration for Radio, Film and Television. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled companies. According to relevant official answers to press questions published on the website of State Administration for Radio, Film and Television on February 3, 2008, officials from the State Administration for Radio, Film and Television and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. These policies have been reflected in the Application Procedure for Audio/Video Program Transmission License. Failure to obtain the internet audio/video program transmission license may subject an online audio/video service provider to various penalties, including fines of up to RMB30,000, seizure of related equipment and servers used primarily for such activities and even suspension of its online audio/video services.
>
> ***On December 16, 2016, the State Administration of Press, Publication, Radio, Film and Television of the PRC (SAPPRFT)***

> ***issued the Rules for the Administration of Video and Audio Programs on Weibo, WeChat and other Social Media Platforms, or Circular 196. Circular 196 requires that any organizations that provide online streaming through social media platforms such as Weibo or WeChat should obtain an internet audio/video program transmission license. For organizations and individuals that do not hold license, the hosting social networking platform shall be responsible for supervising the content of the posted programs, and the scope of the programs must not exceed the scope stated on the platform's audio/video program transmission license. Similarly, film and TV dramas broadcasted through social media are required to obtain a license for public airing, and social media platforms are not allowed to repost user-generated video or audio programs featuring political news.***

70. The above statements in paragraphs 68 and 69 (identified in emphasis) were materially misleading because they created the false impression that Weibo was complying with PRC regulations concerning the audio/video program transmission license. By representing that the content on Weibo originated through third-party websites, Defendants indicated to investors that Weibo was not at risk of violating Circular 56. In reality, Weibo was violating Circular 56 by routing content through third-parties instead of holding the license itself. Defendants' statements omitted material information about Circular 56, namely that it applied to Weibo and that Weibo was operating in violation of the regulation. In addition to violating Circular 56, Weibo was violating the recently enacted Circular 196 which again reiterated the requirement for Weibo to hold a license and tasked the Company with being the responsible entity to monitor content posted "using Weibo" ensuring that

such content did "not exceed the business scope specified by the platform's permit" – a permit it did not hold as required by the regulation.

71. In addition, the 2016 20-F was accompanied by SOX certifications by Defendants Wang and Yu. In these certifications, Wang and Yu both attested that the 2016 20-F:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> . . .
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:
>
> > a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our

> conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> . . .

> 5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

72. Wang and Yu's SOX certifications were materially misleading. As explained previously, the 2016 20-F failed to accurately describe Weibo's compliance with PRC regulation. The 2016 20-F, therefore, contained untrue statements and omitted "material fact[s] necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To the extent Wang and Yu established and maintained adequate disclosure controls, they disregarded these controls when certifying the 2016 20-F and, as a result, created the false impression that the 2016 20-F was accurate in all material respects.

## VI. THE TRUTH EMERGES

73. On June 22, 2017, Weibo issued a press release entitled "Weibo Announces Receipt of a SAPPRFT Notice," stating in relevant part:

> **Weibo Announces Receipt of a SAPPRFT Notice**
>
> NEWS PROVIDED BY
> **Weibo Corporation**
> 22 Jun, 2017, 09:40 ET
>
> BEIJING, June 22, 2017 /PRNewswire/ -- Weibo Corporation ("Weibo" or the "Company") (NASDAQ: WB), a leading social media in China, today announced that it became aware of a public notice issued by The State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China (the "SAPPRFT"), stating that the ***SAPPRFT had recently requested the local competent authorities to take measures to suspend several companies' video and audio services due to their lacking of an internet audio/video program transmission license*** and posting of certain commentary programs with content in violation of government regulations on their sites, and Weibo is named as one of these companies.
>
> The Company is communicating with the relevant government authorities to understand the scope of the notice. It intends to fully cooperate with the relevant authorities. The Company will also evaluate the impact of this notice on its operations and its administrative options.

Emphasis added.

74. On this news, Weibo's share price fell $4.71 per ADS, ***or over 6***% from its previous closing price of $76.96 per ADS on June 21, 2017, to close at $72.25 per ADS per share on June 22, 2017, severely damaging investors.

## VII. <u>POST-CLASS PERIOD EVENTS</u>

75. On August 9, 2017, prior to market open, Weibo held a conference call reporting the Company's second quarter 2017 financial results. On this call, Defendant Yu ***revealed that Weibo had received a fine*** for operating without the audio/video transmission license:

> Turning to June 22 Chinese government notice, on June 22, a notice was made public by the State Administration of Press, Publication, Radio, Film and Television or SAPPFRT in short that suspends several companies' video and audio program services ***due to their lacking Internet, audio, video program transmission license*** and posting on their sites of certain commentary programs with content that the SAPPFRT believed to have violated government regulations and Weibo is named as one of these companies. We have been working closely with the relevant government authorities to take corrective measures and ***have received a fine from the authorities on this matter.***

76. It was announced on September 15, 2017 that Defendant Yu suddenly resigned "to pursue other opportunities" and that the Vice President of Finance would serve as the Chief Financial Officer until a successor was appointed.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

77. As alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly

and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

78. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer of Weibo and, thus, controlled the information disseminated to the investing public in the Company's SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

79. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's business, operations, growth, financial statements, and financial condition. Such actions allowed Weibo to artificially inflate net revenue and the Company's stock price. The Individual Defendants' scienter may be imputed to Weibo as the Individual Defendants were among Weibo's most senior management and were acting within the scope of their employment.

**A. Weibo Violated Chinese Regulations.**

80. Circular 56 issued by The State Administration of Radio, Film and Television and the MIIT, clearly states that Weibo must have an audio/visual transmission license in order to post and stream audio-visual content:

> Article 2: These ***Provisions shall apply to the provision of audio-visual program service via internet*** (including mobile

> internet, hereinafter referred to as internet) within the borders of the People's Republic of China. The term "internet audio-video program service" as mentioned in these Provisions refers to activities of making, redacting and integrating audio-visual programs, providing them to the general public via internet, and providing services for other people to upload and spread audio-visual programs.
>
> Article 7: ***To engage in internet audio-visual program service, one shall, in accordance with these Provisions, obtain the Permit for Spreading Audio-Visual Programs via Information Network*** (hereinafter referred to as Permit) issued by the competent department of radio, film and television, or handle the archive-filing formalities. ***No entity or individual may engage in internet audio-video program service without obtaining the Permit*** issued by the competent department of radio, film and television, or handling the archive-filing formalities.

81. In order to obtain said "Permit," the entity must be "an exclusive state-owned entity or a state-controlled entity" (Circular 56, Article 8), or if not state-owned or controlled, operating lawfully prior to the regulation's issuance in 2007 (official answers to press questions published on the website of State Administration for Radio, Film and Television on February 3, 2008).

82. Instead of legally obtaining a permit, Weibo attempted to circumvent the law, purposely leading investors to believe it was permissible for the Company to deliver audio/video programs through third-party websites with the permit, omitting to inform the investors that their circumvention was specifically prohibited. ***Circular 56 clearly prohibits "sub-contracting" of licenses***, stating: "Article 14: … No licensed entity may provide fee collection services, signal transmission, server

hosting and other related financial and technical services in connection with internet audio-visual program services to any entity on behalf of or for the benefits of any unlicensed or unregistered third party." ***Weibo failed to inform investors of this known prohibition, which it clearly violated*** and would have prevented Weibo from obtaining and sustaining its current revenues and profitability.

83. The enactment of Circular 196 confirms that Defendants acted with scienter. Circular 196 explicitly named Weibo within its provisions and stated in no uncertain terms that Weibo should have an audio/video transmission permit. Circular 196 operated as a "red flag" for the purposes of scienter, and confirmed to Defendants that they were acting in violation of the law.

84. Defendants Wang and Yu both attested and certified to investors under SOX that they established and maintained disclosure controls and procedures "to ensure that material information relating to the Company…is made known" and that the Company's reports did not "contain any untrue statement of a material fact or omit to state a material fact." These attestations were false and misleading when made as Weibo failed to inform investors of the material fact that the Company was knowingly violating PRC regulations. The fact that Wang and Yu attested to the statements in Weibo's SEC filings while knowing the statements were materially misleading strongly supports the conclusion that they acted with an extreme and deliberate disregard for the risk of misleading investors.

**B. The User Segment Drives All of Weibo's Revenue.**

85. During the Class Period, the Individual Defendants were Weibo's most senior executives with direct control and supervision over its business, operations, and public statements. By virtue of their executive positions, the Individual Defendants knew non-public material facts concerning Weibo's users and content, which was the Company's core business, and the related Chinese laws and regulations.

86. As stated above at paragraph 32, Weibo generated the majority of its revenue from advertising and marketing. In order to attract companies to advertise or market their products on the Weibo platform, the Company must have enough users to warrant such. The Company acknowledges this dynamic throughout the Class Period. For example, the 2014 Prospectus, 2014 20-F, and 2015 20-F all state (2016 20-F has similar statement):

> Our success depends on our ability to provide users with interesting and useful content, which in turn depends on the content contributed by our users and platform partners. We believe that one of our competitive advantages is the quality, quantity and open nature of the content on Weibo, and that access to rich content is one of the main reasons users visit Weibo.
>
> * * *
>
> If we experience a decline in the number of users or the level of user engagement, customers may not view our products and services as attractive for their advertising and marketing expenditures and may reduce their spending with us, which would harm our business and operating results.

87. In fact, the Company fully recognizes that its "revenues are ultimately affected by the growth of our active user base, and strategies we pursue to achieve active user growth may affect our costs and expenses and results of operations." (2014 Prospectus, 2014 20-F, 2015 20-F, similar statement in 2016 20-F).

88. The necessity of high numbers of users and interesting content was also recognized throughout the Class Period by the Individual Defendants during conference calls. For example, during the Fourth Quarter 2016 Earnings Results call on February 22, 2017, Defendant Wang states:

> The ecosystem of Weibo's platform is developed around three core components; users, content and customers. Our massive user base enable content creators to quickly build social assets and pursue their monetization aspirations. This promotes high quality content to be shared and distributed on Weibo, attracting users, starting conservations and thereby increasing our user base and user engagement. Ultimately, the data that we gather from user engagements in the social networks formed by users asking us distribution channels help us establish more effective connections between our users and customers, increasing Weibo's marketing effectiveness. As these two components come into play and reinforce one and another, it will continually increase Weibo's size and value [indiscernible] competitive advantages in the social media industry.

89. Clearly, if Weibo was unable to provide users with the ability to view and post videos, its number of users would decrease and consequently its revenues from advertisers would also decrease. Thus, Defendants falsely assured investors and customers that Weibo did not need such a license and was in full compliance

with Chinese laws because the Company was permitted under law to use a third-party instead of obtaining its own audio/video license.

## C. Weibo's $260 Million IPO

90. Defendants' fraudulent scheme and materially false and misleading statements ensured the success of the Company's entry into the United States public equity markets. From the start, Defendants knew that investors would pay special attention to Weibo's compliance with the often strict Chinese regulations over the media and place significant importance on Weibo's statements on the matter.

91. In fact, United States analysts frequently reported on Weibo's compliance with Chinese regulations and during April of 2014, the month of Weibo's initial public offering, JG Capital wrote "[b]ased on our previous conversations with management, we believe that . . . Weibo [has] high confidence in their communication and cooperation with the Chinese government, and that the positive relationship will bring healthy growth to Weibo. Also we believe investors' concerns that the government may one day shutdown Weibo are overblown."

92. Defendants' materially false and misleading statements regarding Circular 56 allowed Weibo to sell 16.8 million ADSs at $17 per ADS during its initial public offering, garnering proceeds of more than $265 million for the Company, more than doubling its actual cash on hand. The initial public offering

based on materially false and misleading statements had its intended results, allowing Weibo to "enhance [its] brand recognition" and repay its former parent Sina the entire amount due on an interest-bearing loan in the amount $276.6 million.

### D. Insider Stock Sales

93. The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Weibo's securities price and maximize their individual profits through insider trading.

94. Tellingly, within approximately thirty (30) days of the revelation of Defendants' fraudulent scheme, between May 19, 2017 and June 8, 2017, five Weibo officers and directors sold (or at least attempted to sell according to their Form 144s) almost 1 million shares of Weibo securities resulting in over $75 million in proceeds. ***Defendant Wang alone accounted for a quarter of the sales with proceeds of almost $20 million – the first and only sale made by Defendant Wang since Weibo's IPO.*** If Defendant Wang had sold after the truth emerged, his proceeds would have decreased by almost $700,000, or 3.6%.

95. These sales were dramatically out of line with prior trading practices and none were pursuant to a Rule 10b5-1 plan. As can be seen in the chart below listing the Form 144 sales, the almost 1 million shares sold immediately before the

corrective disclosure on June 22, 2017, ***exceeded all other shares sold during the Class Period by 300,000.***

96. Defendant Yu also profited from his insider knowledge selling 437,500 shares during the Class Period, ***his only sales, for proceeds of over $21 million***.

| **Insider** | **Position** | **Date** | **Shares** | **Price** | **Proceeds** |
|---|---|---|---|---|---|
| Gaofei Wang | CEO | 6/8/17 | 250,000 | $75.00 | $18,750,000 |
| Herman Yu | CFO | 9/22/16 | 100,000[5] | $49.32 | $4,931,500 |
| | | 9/29/16 | 168,750 | $47.81 | $8,067,937 |
| | | 9/19/16 | 168,750 | $48.68 | $8,215,318 |
| Charles Guowei Chao | Chairman | 6/8/17 | 500,000 | $77.63 | $38,815,000 |
| Chen Family Trust | Shareholder & Officer | 5/22/17 | 10,000 | $81.00 | $810,003 |
| | | 6/7/16 | 7,900 | $28.38 | $224,164 |
| | | 6/1/16 | 30,000 | $27.02 | $810,474 |
| Hong Du | Director | 6/8/17 | 100,000 | $78.82 | $7,882,000 |
| Yajuan Wang | VP | 5/30/17 | 60,000 | $77.57 | $4,654,200 |
| Yan Wang | VP | 9/1/16 | 17,500 | $47.77 | $835,975 |
| | | 12/16/15 | 20,000 | $18.55 | $371,000 |
| | | 3/16/15 | 25,400 | $14.18 | $360,172 |
| Yi Chen Zhang | Officer | 9/29/16 | 89,350 | $51.54 | $4,605,099 |
| | | 5/20/16 | 60,000 | $23.10 | $1,386,000 |
| Bin Zheng | Officer | 5/19/17 | 83,334 | $79.04 | $6,586,719 |

## IX. LOSS CAUSATION

97. The market for Weibo securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failure to disclose, Weibo securities traded at artificially inflated

[5] This is the only sale for all insiders based on a Rule 10b5-1 plan.

prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Weibo securities relying upon the integrity of the market of Weibo and market information related to the Company, and have been damaged thereby.

98. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities.

99. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Weibo's compliance with PRC regulations, as alleged herein. Throughout the Class Period, Defendants publically issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Weibo's securities to be artificially inflated. Plaintiff and other Class members purchased Weibo's securities at those artificially inflate prices, causing them to suffer the damages complained of herein. For example:

- In response to a November 18, 2015 after market close earnings call announcing that Weibo's "daily video views…increased 82% from the previous quarter," the Company's stock price

increased from $17.67 per ADS on November 18, 2015 to $18.02 per ADS on November 19, 2015.

- In response to a November 20, 2016 after market close earnings call announcing that Weibo's "[d]aily video views in September increased 740% year-over-year," among other things, the Company's stock price increased from $44.28 per ADS on November 18, 2016 to $45.61 per ADS on November 21, 2016.

100. As detailed above, on June 22, 2017, when Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market on the news of the PRC's suspension of Weibo's audio/video service due to its lack of the appropriate license, the artificial inflation in the price of Weibo's securities was removed, and the price of Weibo's securities fell $4.71 per ADS, or over 6% from its previous closing price of $76.96 per ADS on June 21, 2017 to $72.25 per ADS on June 22, 2017.

101. As a result of their purchases of Weibo securities during the Class Period at artificially inflated prices, Plaintiff and other Class members suffered economic loss, i.e., damages, under the federal securities laws.

102. The timing and magnitude of the price decline in Weibo's stock negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

103. Defendants' materially misleading statements and omissions concealed a risk concerning Weibo's non-compliance with PRC regulation. This risk

materialized in the form of PRC violations and fines, which communicated to investors that Defendants' prior statements had been materially misleading. Defendants' materially misleading statements caused Weibo investors to sustain significant losses.

## X. CLASS ACTION ALLEGATIONS

104. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Weibo's securities between April 17, 2014 and June 21, 2017, inclusive and who were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, the variable interest entities of the Company, and Sina, at all relevant times, and the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

105. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Weibo securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from

records maintained by Weibo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

108. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Weibo;

(c) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d) whether the prices of Weibo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

109. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficultly in the management of this action as a class action.

## XI. NO STAUTORY SAFE HARBOR

110. The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations or omissions alleged in this Consolidated Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

111. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

112. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Weibo who knew that the statement was false when made.

## XII. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

113. At all relevant times, the market for Weibo securities was an efficient market for the following reasons, among others:

(a) Weibo securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, Weibo filed periodic public reports with the SEC and/or NASDAQ;

(c) Weibo regularly communicated with public investors via established market communication mechanisms;

(d) Weibo was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(e) Unexpected material news about Weibo was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

114. As a result of the foregoing, the market for Weibo securities promptly digested current information regarding Weibo from all publicly available sources and reflected such information in Weibo's stock price. Under these circumstances, all purchasers of Weibo securities during the Class Period suffered similar injury through their purchase of Weibo's securities at artificially inflated prices, and a presumption of reliance applies.

115. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that

Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>

***<u>Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder</u>***

***<u>Against All Defendants</u>***

116. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against all Defendants.

118. During the Class Period, Defendants carried out a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and other members of the Class; made various untrue

statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members as alleged herein; (ii) artificially inflate and maintain the market price of Weibo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Weibo securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

119. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Weibo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Weibo's business operations and future prospects.

120. By virtue of their positions at Weibo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged

herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

121. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Weibo, the Individual Defendants had knowledge of the details of Weibo's internal affairs.

122. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Weibo. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Weibo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the

market price of Weibo's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Weibo's business operations and financial condition which were concealed by the Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Weibo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

123. During the Class Period, Weibo securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Weibo securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Weibo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Weibo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

124. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period.

**COUNT II**

***Violations of Section 20(a) of the Exchange Act***

***Against The Individual Defendants***

126. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127. During the Class Period, the Individual Defendants participated in the operation and management of Weibo, and conducted and participated, directly and indirectly, in the conduct of Weibo's business affairs. Because of their senior positions, they knew the adverse non-public information about Weibo's operations, current financial position and future business prospects.

128. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to Weibo's business practices, and to correct promptly any public statements issued by Weibo which had become materially false or misleading.

129. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Weibo disseminated in the marketplace during the Class Period concerning the Company's disclosure controls, business operations and future prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Weibo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Weibo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Weibo securities.

130. Each of the Individual Defendants, therefore, acted as a controlling person of Weibo. By reason of their senior management positions and/or being directors of Weibo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Weibo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Weibo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

131. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Weibo.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure Rule 23 and Plaintiff's Counsel as class counsel;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 27, 2017

**LEVI & KORSINSKY, LLP**

*/s/ Eduard Korsinsky*
Eduard Korsinsky (EK-8989)

30 Broad Street, 24th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

- and -

Shannon L. Hopkins*
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

- and -

Nicholas I. Porritt*
Adam A. Apton*
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

**pro hac vice* forthcoming